Jacob **KRIPPELZ**, Sr., Plaintiff,

v.

**FORD MOTOR COMPANY**, Defendant.

**No. 98 C 2361.**

United States District Court,
N.D. Illinois,
Eastern Division.

Nov. 18, 2009.

James D. Ryndak, Catherine Lee Gemrich, Eric H. Weimers, Mark K. Suri, Ryndak & Suri LLP, Chicago, IL, Adam K. Mortara, Hamilton H. Hill, Mark Edward Ferguson, Martha M. Pacold, Bartlit Beck Herman Palenchar & Scott LLP, David L. Schwartz, Wallenstein Wagner & Rockey, Ltd., Chicago, IL, for Plaintiff.

Alfred M. Swanson, Jr., Greene & Letts, Edward L. Foote, Peter Charles McCabe, III, Winston & Strawn LLP, Chicago, IL, Daniel M. Stock, Frank A. Angileri, John S. Le Roy, Seth E. Rodack, Thomas A. Lewry, Brooks Kushman PC, Southfield, MI, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES B. ZAGEL, District Judge.

### INTRODUCTION

This case involves Defendant Ford Motor Company's "puddle lamps." Krippelz is the sole inventor and owner of U.S. Patent No. 5,017,903. (PX1, "the '903 patent.") The puddle lamps installed on many of Ford's most popular vehicles infringe claim 2 of the '903 patent. Krippelz sued Ford on April 16, 1998 for infringement of the '903 patent. (Dkt. No. 1, 4/16/98 Complaint.)

This Court granted Krippelz's motion for summary judgment of infringement of all accused models on November 21, 2008. (11/21/08 Hr'g Tr. 9:24–19:11.) The parties tried the issues of invalidity and damages to a jury. At the end of a five-day trial, the jury found the '903 patent valid and awarded Krippelz $23 million in damages.

Before the jury trial, the parties agreed to try the issue of willful patent infringement separately to the Court rather than to the jury. (Dkt. No. 395, 12/5/08 Stipulation Regarding Trial of Willful Infringement To The Court.) The parties further agreed to present the issue by way of written submissions rather than by live evidence. (Dkt. No. 418, 12/16/08 Parties' Joint Motion To Set A Briefing Schedule Regarding Willful Infringement.) The parties briefed the issue of whether Ford's infringement was willful and the Court heard oral argument on March 10, 2009.

Following are findings of fact and conclusions of law addressing Ford's liability for willful infringement. To the extent that any conclusions of law may be deemed findings of fact, or vise versa, they should be considered as such, and the labels used herein need not be controlling. See 9C Wright & Miller, Federal Practice & Procedure, § 2579 (3d ed. 2008).

These findings of fact and conclusions of law address only whether Ford's infringement was willful, and not what enhancement of damages is appropriate as a consequence of Ford's conduct. The Court will consider the amount of enhancement separately.

### LEGAL STANDARD

■ 1. Willful infringement is an issue of fact. *Stryker Corp. v. Intermedics Orthopedics, Inc.,* 96 F.3d 1409, 1413 (Fed. Cir.1996).

■ 2. The current law of willful infringement is found in the en banc case of *In re Seagate Tech., LLC,* 497 F.3d 1360 (Fed.Cir.2007), which overruled precedent that established a principle of willful conduct which was closely akin to a negligence rule, since it imposed upon an infringer a duty of due care to avoid infringement, and defined a new standard:

> [T]o establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. The state of mind of the accused infringer is not relevant to this objective inquiry. If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer.

497 F.3d at 1371 (citation omitted).

■ 3. Under *Seagate,* "proof of willful[ness] ... requires at least a showing of objective recklessness." *Id.*

4. The Federal Circuit left it to future cases to develop the ways in which the standard should be applied. *Id.*

**5.** Some opinions refer to the question to be determined after the objective risk threshold is crossed as the subjective aspect of the test. The Court thinks of it as the state of mind issue since, in law, state of mind includes both actual states of mind (knowing) and inferred states of mind (should have known means known). Under the *Seagate* standard, both "knowing" and "should have known" are legally culpable states of mind. Thus, if a reasonable party in Ford's position would have believed that Ford was infringing a valid patent, then Ford's infringement was willful.

**6.** While it is true that the law no longer imposes on a potential infringer an "affirmative duty to exercise due care to determine whether or not he is infringing," *Underwater Devices Inc. v. Morrison–Knudsen Co.*, 717 F.2d 1380, 1389 (Fed. Cir.1983), overruled by *Seagate*, 497 F.3d at 1371, *Seagate* does not require that the Court ignore the record. To the contrary, *Seagate* dictates that objective recklessness be determined by reference to the record developed in the infringement proceeding. 497 F.3d at 1371 ("objectively-defined risk" is "determined by the record developed in the infringement proceeding").

**7.** Claims of willful infringement are governed by the circumstances at each stage of the defendant's infringement. The first stage customarily begins when the inventor sends the alleged infringer some form of notice of his, her, or its invention, either as part of a cease-and-desist demand or an offer to sell one or all of the owner's patent rights. The second stage usually begins at a point soon after the lawsuit is filed. Other stages may commence after a decision on reexamination, particular rulings by the court, or the return of a verdict of infringement.

**8.** To the extent that Ford offers evidence, as an infringer may be entitled to do,[1] that its heart was pure on the issue of infringement even if its head was empty, it is beyond the boundaries defined by the way this case was tried.

**9.** In other words, while Ford says it is defending this motion only on the basis of objective indicia (Dkt. No. 442, 2/6/09 Ford Motor Co.'s Br. Opposing Krippelz's Request For A Finding Of Willful Infringement ("Ford Br.") 7–8), and relies on the argument that certain views, positions, or courses of conduct were "objectively" reasonable, Ford's brief also includes statements directed to Ford's actual state of mind. Such argument is not entitled to any weight, as there is no evidence of what "Ford believed," or otherwise indicating the subjective state of mind of any Ford decision maker.

**10.** Subjective state-of-mind evidence was discussed earlier in the case, but Ford did not offer the testimony of the actual state-of-mind witness that it named in pre-trial proceedings. Indeed, Ford did not offer the testimony of any witness on this subject.

**11.** Ford represented to the Court that former Ford attorney Daniel Stock could explain Ford's decision to continue infringing Krippelz's patent:

> And secondly, and so there is nobody who has the ties back to '98 other than Dan Stock throughout this—for this lawsuit. There is nobody who has this big

---

**1.** The Court says "may" because it is difficult to see how, in an ordinary case, evidence that an infringer personally believed it was not infringing has real importance under *Seagate* which holds that the standard is "should have known." Evidence of actual knowledge of the risk of infringement would be of crucial importance to a plaintiff if it did exist. The absence of actual knowledge is not a meaningful circumstance in the determination of whether an infringer should have known of the risk of infringement.

picture of knowledge of what happened and why. And, ultimately, it was Dan Stock's decision to either, you know, allow people to go forward with these Puddle Lamps or tell them no, you can't do this, because we have problems. And in that sense, he made the decision. There is nobody that relied on it in any sense other than Dan says, yes, go do it, or Dan says, no, don't do it because we've got problems.

(Ex. AA To Nonrestricted Exhibits Certification,[2] 12/3/08 Hr'g Tr. 17:22–18:6.)

12. Ford did not offer Mr. Stock's testimony, and thus cannot ask the Court to consider "what Ford saw with its own eyes" or what "Ford believed." (See, e.g., Ford Br. 2 ("Ford continued to believe . . .") 20 (what "Ford Saw With Its Own Eyes") 25 ("Ford disclosed to Krippelz several prior art references that Ford believed invalidated claim 2"), 29 n. 20 ("Ford believed that Miazzo and DuBois were enough"), 33 ("Ford did not believe that it was infringing Krippelz's patent").) Ford's arguments referring to what Ford employees and agents believed or did not believe are not evidence and therefore are given no weight.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

13. To organize the discussion of the voluminous evidence in a comprehensible format, the Court uses the four stages that Krippelz suggested; they seem reasonable as dividing lines in this case. They are: (1) the period from the issuance of the Krippelz patent in 1991 through Ford's first disclosure of its invalidity defenses in March 1999; (2) the period from March 1999 through the Board of Patent Appeals' confirmation of the '903 patent's claims in February 2002; (3) the period from the Board's February 2002 decision through Ford's disclosure of its trial invalidity defenses in April 2007; and (4) the period from April 2007 through the end of trial.

14. As set forth below in more detail, the Court finds that Krippelz has shown by clear and convincing evidence that Ford willfully infringed the '903 patent throughout periods 1 through 3.

15. When Ford's conduct is viewed in its totality throughout periods 1–3, the evidence clearly and convincingly demonstrates that (1) Ford "acted despite an objectively high likelihood that its actions constituted infringement" of Krippelz's valid patent, and (2) this objectively defined risk was so obvious that it should have been known to Ford. *Seagate*, 497 F.3d at 1371.

16. The Court finds that Krippelz has not shown by clear and convincing evidence that Ford willfully infringed the '903 patent in period 4.

## I. Period 1: Prelitigation Through March 1999

17. Period 1 includes the time before the suit was filed in April 1998 (the time beginning with the issuance of the patent in 1991) and ends in late March 1999 when

**2.** Exhibits cited simply as "Ex. ___" without further indication of origin are exhibits to Dkt. No. 436, 1/16/09 Certification Of Hamilton H. Hill In Support Of Krippelz's Opening Brief On Willful Infringement. Exhibits cited as "Ford Br. Ex. ___" are exhibits to Dkt. No. 442, 2/6/09 Ford Motor Co.'s Br. Opposing Krippelz's Request For A Finding Of Willful Infringement. Exhibits cited as "Ex. ___ To Restricted Exhibits Certification" are exhibits to Dkt. No. 453, 2/20/09 Certification Of Hamilton H. Hill In Support Of Krippelz's Reply Brief On Willful Infringement For Restricted Exhibits (Dkt. No. 453, filed Feb. 20, 2009). Exhibits cited as "Ex. ___ To Nonrestricted Exhibits Certification" are exhibits to Dkt. No. 451, 2/20/09 Certification Of Hamilton H. Hill In Support Of Krippelz's Reply Brief On Willful Infringement For Nonrestricted Exhibits. Citations to "PX ___" are to plaintiff's exhibits admitted at trial. Citations to "JX ___" are to joint exhibits admitted at trial.

Ford disclosed its first set of prior art that Ford alleged invalidated the Krippelz patent.

### A. Ford Knew Of The Krippelz '903 Patent Shortly After It Issued In 1991, Before Ford Began Selling Puddle Lamps

■ 18. Beginning in period 1, Ford had actual knowledge of the Krippelz patent.

19. Krippelz sent a copy of his '903 patent to Ford soon after it issued in 1991. Krippelz testified without challenge that he notified Ford of his patent by sending it to Ford soon after the patent issued in 1991. (12/10/08 Trial Tr. 397:14–23.) Ford did not object to or dispute Krippelz's testimony at trial. Ford counsel did not cross-examine Krippelz on this issue or otherwise rebut Krippelz's testimony.

20. Ford argues that this testimony was "self-serving" and criticizes Krippelz for not retaining a copy of this letter for the intervening six years between the issuance of the '903 patent and Ford's first infringement.[3] (Ford Br. 3–4.) Ford asks the Court to infer that, because Krippelz did not produce the letter that accompanied a copy of his patent, the patent was not sent to Ford.

21. What Krippelz did produce was a draft in which he stated he had applied for a patent (mentioning the application number of the '903 patent) and would tender the patent application if Ford signed a confidentiality agreement. (Ford Br. Ex. 2.) Ford points to the draft letter and argues the draft letter must show that Krippelz never sent a letter to Ford with the issued patent itself. (Ford Br. 3–4 & Ex. 2.)

22. Implicit in the circumstances here is the possibility that the draft letter may never have been sent, perhaps because Krippelz waited for the patent to issue or because the patent issued before the letter was sent. Once the patent issues there is no need for a confidentiality agreement.

23. The Court makes no finding with respect to the draft letter. As noted above, Krippelz testified that he sent the patent and was neither challenged on cross-examination nor confronted with the draft. (12/10/08 Trial Tr. 397:14–23.) Had Ford believed that the draft letter concerning the earlier patent application would have called Krippelz's testimony into question, it could have attempted to bring this out on cross examination.

24. The Court had an opportunity to assess Krippelz's credibility at trial. The Court credits Krippelz's testimony which was offered in the Court's presence. The sending of the patent made good sense for Krippelz. He was not in a position to put his invention into commerce; he did not make automobiles or their parts. His market was automakers and their suppliers. It is quite reasonable that he would send his patent, once issued, to an automaker, and that is what he did.

25. There was no careful internal search for Krippelz's letter.

26. After Krippelz sent Ford his patent, Ford truthfully told Krippelz that it was not interested in Krippelz's invention. (12/10/08 Trial Tr. 397:20–23.) The Court believes that Ford was not, in fact, interested. Ford had not sold lamps of the type Krippelz was suggesting at the time it received the patent. The lamp that Ford did sell was brought to Ford in 1993 by

3. Ford's first infringement was in 1997 (model year 1998). *See* 12/10/98 Trial Tr. 571:17–22; 12/11/08 Trial Tr. 726:5–727:12, 730:20–22, 819:9–14; *see also* PX147, Detail of Ford Puddle Lamp Mirror Assembly Purchases by Model Year/Calendar Year From Ford Suppliers Through Approximately October of 2008 (chart showing number of infringing sales and model year/calendar year information for those sales).

Donnelly, a parts manufacturer that wanted to sell the part to Ford.

27. In sum, the Court finds that Ford was aware of Krippelz's '903 patent shortly after it issued in 1991, well before Krippelz filed this suit in April 1998.

■ 28. Knowledge of the '903 patent is not the same thing as knowledge of the high likelihood that one's actions constituted infringement of a valid patent. However, one is far more likely to know of the infringement risk if one knows of the patent.

29. Ford's puddle lamp supplier Donnelly also had possession of the '903 patent in mid–1993 before it sold a puddle lamp mirror housing to Ford years later. (12/11/08 Trial Tr. 749:17–750:21, 760:21–761:4.) Donnelly had a patent, the '659 patent, that Ford eventually licensed from Donnelly for non-Donnelly supplied puddle lamps, in October 1998. (Ex. B, Donnelly '659 Patent 1.)

30. The '659 patent issued in 1994, before the initiation of this lawsuit. (*Id.*)

31. Ford had knowledge of the Donnelly '659 patent prior to the initiation of this lawsuit and knew that the Donnelly '659 patent was relevant to the puddle lamp products Ford was selling. Ford sold its first Donnelly-supplied puddle lamp in 1996. (12/9/08 Trial Tr. 217:6–12.)

32. When this lawsuit was filed, two of Ford's suppliers, Donnelly and Britax, were engaged in patent litigation regarding the Donnelly '659 patent as it pertained to sales of the Ford Explorer puddle lamp. (*Donnelly Corp. v. Britax Rainsfords Inc.*, Case No. 1:98–cv–00127–DWM (W.D.Mich.) (filed Feb. 10, 1998)). Britax was a Donnelly competitor. Britax supplied Ford with an allegedly infringing device that Ford was selling.

33. Thus, Ford was aware of the '659 patent before Krippelz filed suit. (*See id.*; *see also* Ex. Y To Nonrestricted Exhibits Certification, 7/13/98 Britax Third–Party Complaint Against Ford 5–12, 19–24.)

34. The Donnelly '659 patent, which Ford had prior to the initiation of this suit, lists the Krippelz patent on its face, indicating that the Krippelz patent was potentially relevant to Ford's puddle lamp products. (Ex. B, Donnelly '659 Patent 1.)

35. Ultimately, Ford's examination of the Donnelly '659 patent prompted it to license the patent from Donnelly for sale of the Britax-supplied puddle lamps, ending the dispute between Donnelly and Britax. (Ford Br. Ex. 46.) Ford obtained that license in October 1998. (*Id.*)

36. Despite the fact that Ford began selling Donnelly-produced puddle lamps in 1996 and licensed the '659 patent in 1998, it still did not investigate the Krippelz patent or look into its prosecution history.

37. The Court finds based on the totality of the facts and circumstances that Ford knew or should have known there was a high degree of risk that it was infringing the Krippelz '903 patent before the litigation began.

1. **The Court Need Not Reach Krippelz's Argument That Donnelly's Knowledge Of The Krippelz Patent Is Imputed To Ford**

38. Krippelz argues that Ford's supplier, Donnelly, was an agent of Ford, and Donnelly clearly had knowledge of the '903 patent. Krippelz argues that Donnelly's knowledge is imputed to Ford to the extent that Donnelly is indemnifying Ford. (See Dkt. No. 435, 1/16/09 Krippelz's Opening Br. On Willful Infringement ("Krippelz Opening Br.") 5.) Krippelz argues that Ford's standard terms and conditions require patent indemnification from Ford's suppliers. (See Dkt. No. 452, 2/20/09 Krippelz's Reply Br. On Willful Infringement ("Krippelz Reply Br. ") 3.)

Ford contends that "Donnelly is not an agent of Ford." (Ford Br. 5.)

39. The Court sees no need to reach this issue. The agent's knowledge can be imputed to the principal, although the case law on the point is undeveloped. The premise upon which Krippelz relies is that the knowledge of Donnelly is Ford's knowledge "[t]o the extent that Ford relied on Donnelly to investigate intellectual property issues or indemnify Ford regarding Donnelly's puddle lamp concept." (Krippelz Opening Br. 5.) But that "extent" is not clear to the Court.

40. The evidence shows that Ford requires its suppliers to indemnify it if it must pay infringement damages for use of the supplier's parts. (See Ex. A To Restricted Exhibits Certification, 7/11/07 Damian Porcari Dep. 23:13–24:15 (identifying Porcari Dep. Exs. 2, 3, and 4 as examples of Ford's "global terms and conditions that apply to all of our suppliers"); Ex. C To Restricted Exhibits Certification, Porcari Dep. Ex. 2 at 6 15(a) (example of Ford's standard terms and conditions that it demands from its suppliers requiring the supplier to indemnify Ford against infringement claims); Ex. D To Restricted Exhibits Certification, Porcari Dep. Ex. 3 at 13 § 21 (same); Ex. E To Restricted Exhibits Certification, Porcari Dep. Ex. 4 at 8 15(a) (same).)

41. But this is not necessarily sufficient to find that Ford relied upon the supplier to investigate infringement. Specific reliance on a supplier to investigate infringement is precisely the kind of relationship that can often be deemed one of principal and agent.

42. The expectation that a supplier's self-interest arising from the obligation to indemnify will cause the supplier to check for infringement may not suffice to create agency. The Court sees no need to sort through the details of the relationship and the fuzzy precedent to resolve this question when the Court has found as a fact that Ford had direct knowledge of the '903 patent and its potential relevance to puddle lamps before the initiation of this litigation.

**B. Despite Ford's Knowledge Of The Krippelz Patent And Its Relevance To The Puddle Lamp Product, Ford Possessed No Reasonable Infringement Or Invalidity Defense Before Litigation**

43. No document produced or privilege log entry reflects any prelitigation investigation by Ford regarding the Krippelz '903 patent. Ford did not (a) investigate the '903 patent to determine possible infringement or invalidity during this period or (b) obtain the '903 prosecution history before this litigation. Ford nevertheless sold puddle lamps starting in 1997 (model year 1998) as an option on Ford Explorers and Mercury Mountaineers, and subsequently on many other models, despite knowledge of the Krippelz patent and its relevance to puddle lamps.

44. The question is whether there was an objectively high likelihood that Ford was infringing a valid patent—i.e. whether Ford had reasonable defenses that would indicate Krippelz did not have a high likelihood of prevailing.

**1. Infringement: Ford Had No Reasonable Non–Infringement Defense Before March 1999**

45. Ford had no objectively reasonable non-infringement defense in period 1.

46. Ford's own System Design Specification for the puddle lamp project indicated that the light from the puddle lamp was to illuminate an area on the ground next to the vehicle, which made the relevance of the Krippelz '903 patent clear. (Ex. D, 1995 Ford System Design Specification at FORD000404.) Ford's second puddle

lamp supplier (Truck–Lite Co./Britax) also created design documents that showed that the light from the puddle lamp was to illuminate an area on the ground next to the vehicle. (Ex. C, 1995 Truck–Lite Design Document.)

47. Despite its knowledge of Krippelz's patent, Ford proceeded with its puddle lamp project without performing any technical infringement evaluation of its puddle lamps, nor any other investigation into either infringement or invalidity.

48. Ford's document production indicates that Ford did not even have possession of the prosecution history of the '903 patent before the litigation. Krippelz requested that Ford produce documents "relating to the Patent–In–Suit" as well as documents "relating to the definition or meaning of any term or phrase used in the Patent–In–Suit." (Ex. E, 6/19/98 Plaintiff's First Request For Production Of Documents, Request Nos. 8, 16.) Ford never produced any copy of the prosecution history of the '903 patent from its own files.

49. As discussed below in the context of Ford's September 1999 summary judgment brief, Ford did not even proffer a claim construction of key claim terms of the Krippelz patent until after February 2002, when the patent successfully emerged from reexamination. Without formulating a claim construction of key terms such as "conical beam of light," Ford could not have a reasonable non-infringement defense in period 1, because a proper non-infringement analysis requires claim construction. *See Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1358 (Fed.Cir.2008).

50. Ford had no articulated non-infringement defense in period 1, but the Court can assess Ford's conduct during this period by reviewing the defenses Ford offered for the first time early in period 2. If the defenses in period 2 were weak

enough that Ford was objectively reckless in continuing to infringe, then Ford was objectively reckless in period 1, when it lacked even the period 2 defenses.

51. On September 24, 1999, almost half a year after the end of period 1, Ford filed its first summary judgment motion. (Ex. I, 9/24/1999 Br. In Supp. Of Ford Motor Co.'s Mot. For Summ. J. Of Non–Infringement.) In support of that motion, Ford offered no construction of "beam of light" or any other claim term. (*Id.*)

52. The merits of Ford's September 1999 summary judgment argument are examined below in the discussion of period 2, in which the Court finds Ford's position insufficient to provide a good faith non-infringement defense. (See infra 65–67, 85–94.)

53. Ford argues that Krippelz's early infringement claim chart sub silentio offered a claim construction of "beam of light" that equated the term "beam" with any and all "light," 13 creating a non-infringement defense for Ford. (Ford Br. 8–10.) Ford argues, in other words, that Krippelz's early claim chart construed the term "beam of light" to mean any and all "light." (*Id.*)

54. Ford contends this claim chart explains its failure to offer any claim construction. However, Krippelz's early claim chart did not absolve Ford of developing a non-infringement defense that considered each claim term. Among other things, Krippelz provided supplemental interrogatory responses in April 1999. (Ex. I To Nonrestricted Exhibits Certification, 4/9/99 Pl.'s Second Supplemental Answer To Def. Ford Motor Company's Interrog. No. 8 at 2–7.)

55. Moreover, Ford was either aware or should have been aware of the claim construction issues concerning the term "beam of light". (See infra 88–89, 164.)

56. Thus, the evidence shows clearly and convincingly that before litigation and during the early stages of the case, Ford lacked any good faith basis for believing that its puddle lamps did not infringe, and that Ford sold puddle lamps despite an objectively high likelihood that they infringed the Krippelz patent.

### 2. Invalidity: Ford Had No Invalidity Defense Before March 1999

57. Before the litigation and through March of 1999, Ford did not disclose any allegedly invalidating prior art. During this period, Ford asserted no invalidity or unenforceability defense.

58. Ford's own discovery responses confirm this. On May 22, 1998, Krippelz sent Ford a first set of interrogatories requesting information regarding Ford's invalidity defenses. (Ex. G, 5/22/98 Pl.'s Interrogs. Nos. 1 and 2 to Def. (Re: Invalidity Defenses).) On June 19, 1998, Krippelz requested "[a]ll documents relating to any art that Ford contends is prior art to the Patent–in–Suit." (Ex. E, 6/19/98 Pl.'s First Req. for Produc. of Docs., Req. No. 9.)

59. Ford did not produce any prior art until March 26, 1999. (Ex. F, 3/26/99 Def.'s Supplemental Resps. To Pl.'s Interrogs. Nos. 1 and 2 To Def. (Re: Invalidity Defenses) 3 (identifying prior art references).) At that time, Ford first produced the Kim patent application (Korean Application No. 4543/84) as well as other prior art references in its interrogatory response. (*Id.*)

60. Ford began its infringing sales of the 1998 model year Ford Explorer/Mercury Mountaineer puddle lamp in 1997. (See 12/10/98 Trial Tr. 571:17–22; 12/11/08

Trial Tr. 726:5–727:12, 730:20–22, 819:9–14; see also PX147, Detail of Ford Puddle Lamp Mirror Assembly Purchases by Model Year/Calendar Year From Ford Suppliers Through Approximately October of 2008 (chart showing number of infringing sales and model year/calendar year information for those sales).) Thus, Ford began its infringing sales in 1997, and for nearly two years thereafter, Ford did not produce any potentially invalidating prior art.

61. It was not until March 1999 that Ford produced the Kim reference. (Ex. F, 3/26/99 Def.'s Supplemental Resps. To Pl.'s Interrogs. Nos. 1 and 2 To Def. (Re: Invalidity Defenses) 3 (identifying prior art references including Kim).) Federal Rule of Civil Procedure 26 required Ford to timely supplement its interrogatory responses. The only conclusion supported by the record is that Ford lacked any invalidity defense until some time very near March 1999.[4]

62. Ford thus cannot claim any good faith invalidity defense during period 1.

### II. Period 2: March 1999 Through Confirmation Of Krippelz Patent On Reexamination By Board Of Patent Appeals In February 2002

63. Period 2 begins in March 1999 when Ford first disclosed an invalidity defense (based on the Kim patent and five other references), and ends when the validity of the '903 patent was reaffirmed by the Board of Patent Appeals in February 2002.

64. Ford asserted to this Court during the reexamination that its primary defense was non-infringement. Ford sought sum-

---

4. By its own admission, as of March 26, 1999, Ford had no § 112 invalidity defense. (Ex. F, 3/26/99 Def.'s Supplemental Resps. To Pl.'s Interrogs. Nos. 1 and 2 To Def. (Re: Invalidity Defenses) 5 ("Based on Ford's understanding of claim 2, the only asserted claim, Ford knows of no § 112 defense at this time.").) Thus, Ford disclaimed any reliance on a § 112 defense for period 1.

mary judgment on non-infringement but offered no claim construction to support its argument, although any well-founded argument would have required construction of terms which were not addressed within Ford's motion.

65. Ford unreasonably relied upon its first non-infringement argument—that the '903 patent claim 2 cannot cover any lighting device that shines any type of light on the side of the vehicle—because claim 2 is not limited to a device in which no light of any type strikes the side of the vehicle.

66. Ford unreasonably relied upon its second non-infringement argument-that Krippelz had disclaimed coverage of warning lights that facilitated ingress and egress to the vehicle as to the claim at issue in this case. This second non-infringement argument was transparently wrong, as the cited disclaimer was made with respect to claims not at issue in this lawsuit.

67. Ford also added new puddle lamp designs to other Ford vehicles without conducting a technical analysis of those devices to determine whether they might infringe the '903 patent-in-suit.[5]

68. During this period, the only invalidity arguments Ford disclosed were arguments that were subsequently rejected by the Board of Patent Appeals. None of these invalidity arguments, and none of the prior art on which they were based, were offered at trial.

69. Ford's conduct during period 2, relying on defenses that were at best weak or unsupported while increasing sales of infringing products, is strong evidence of objective recklessness.

70. In more detail, the Court makes the following findings with respect to period 2:

## A. The Board Of Patent Appeals Rejected Ford's Invalidity Defenses And Ford Did Not Present Them At Trial

██ 71. On March 26, 1999, Ford for the first time disclosed invalidity defenses in response to Krippelz's interrogatories. (Ex. F, 3/26/99 Def.'s Supplemental Resps. To Pl.'s Interrogs. Nos. 1 and 2 To Def. (Re: Invalidity Defenses) 3–4.) At that time, Ford disclosed contentions that the '903 patent was invalid as anticipated or obvious based on six prior art references, all patents and patent applications, including the Kim reference. (*Id.* at 3.)

72. These arguments were subsequently rejected by the Board of Patent Appeals and were not offered at trial. Ford's failure to offer any of these references at trial provides objective evidence of the weakness of any arguments based thereon.

73. Ford also never proffered any expert testimony supporting its contention that these references invalidated claim 2 of the '903 patent. Ford's failure to offer admissible expert testimony supporting a defense of invalidity based on these references in this litigation, even during this willfulness phase, further demonstrates the weakness of these defenses. There is no objective record as to the content of Ford's purported invalidity defenses, as no such argument ever was presented by Ford.

74. On August 30, 1999, after having received Ford's invalidity contentions and the cited prior art, Krippelz sought reexamination of the '903 patent. (PX3, Reexamination File History, 8/30/99 Reexamination Request.) On February 25, 2002, the Board of Patent Appeals reaffirmed the validity of all of the claims of the '903

---

5. The Court also finds that Krippelz could reasonably conclude that no purpose would be served by seeking a preliminary injunction.

The Court addresses this point in more detail below. (*See infra* ¶¶ 99–111.)

patent over the prior art Ford relied on, including the Kim reference. (PX3, Reexamination File History, 2/25/02 Board of Patent Appeals & Interferences Decision On Appeal.)

75. During the pendency of the reexamination, Ford's counsel acknowledged that invalidity was not even considered by Ford to be a primary defense:

> The primary issue in the case is not really the validity on our side, Ford's side, although that is a sub-issue. The primary focus for us is on infringement.

(Ex. H, 8/31/99 Hr'g Tr. 2:17–20.)

76. Ford did not include any of its March 1999 invalidity defenses or the related prior art in its expert reports or at trial. This is objective evidence of the weakness of these defenses. *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1126 (Fed.Cir.1993) ("[A] defensive pleading of invalidity or unenforceability may pass muster under Rule 11, yet not provide adequate defense to the charge of willful infringement. Indeed, in this case the pled defense of unenforceability was not pursued at trial."); *see also Tristrata Tech., Inc. v. ICN Pharms., Inc.*, 313 F.Supp.2d 405, 413 (D.Del.2004) (finding that fact that infringer had chosen not to present any non-infringement defense at trial supported jury verdict of willful infringement).

77. Thus, from March 1999 until the February 2002 Board of Patent Appeals decision, Ford had no objectively reasonable invalidity defense.

### 1. Krippelz's Request For Reexamination Is Irrelevant To Willfulness Under Controlling Federal Circuit Law

78. Ford contends that the PTO's grant of the reexamination request "alone, defeats Krippelz's claim that Ford was 'objectively reckless' to assert invalidity." (Ford Br. 26.) Ford also contends that the interim rejection by the PTO during the reexamination provided grounds for Ford having launched several additional puddle lamp models without infringement analysis. (*Id.*)

79. Because Ford has not provided any expert opinion testimony supporting any of its March 1999 invalidity defenses, this is Ford's only available argument concerning its belief in the '903 patent's invalidity for period 2.

80. The proceedings in the '903 reexamination are not sufficient to save Ford from a finding of willfulness. Interim rejections are the norm at the PTO. *See Q.G. Prods., Inc. v. Shorty, Inc.*, 992 F.2d 1211, 1213 (Fed.Cir.1993) ("rejections often occur as part of the normal application process"). The Federal Circuit has specifically rejected Ford's position:

> We take notice that the grant by the examiner of a request for reexamination is not probative of unpatentability. The grant of a request for reexamination, although surely evidence that the criterion for reexamination has been met (i.e., that a "substantial new question of patentability" has been raised, 35 U.S.C. § 303), does not establish a likelihood of patent invalidity. *See Acoustical Design, Inc. v. Control Elecs. Co.*, 932 F.2d 939, 942 (Fed.Cir.) ("initial rejection by the Patent and Trademark Office of original claims that later were confirmed on reexamination hardly justifies a good faith belief in the invalidity of the claims"), cert. denied, 502 U.S. 863, 112 S.Ct. 185, 116 L.Ed.2d 146 (1991).

*Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1584 (Fed.Cir.1996) (footnote and parallel citations omitted).

81. During oral argument on March 10, 2009, Ford's counsel cited two recent cases for the proposition that the grant of a reexamination and interim PTO rejections of reexamined claims prevent a finding of willful infringement. *See Lucent Techs., Inc. v. Gateway, Inc.*, No. 07–CV–2000–H

(CAB), 2007 WL 6955272, at \*6–7, \*8, 2007 U.S. Dist. LEXIS 95934, at \*17–19, \*22 (S.D.Cal. Oct. 30, 2007); *Pivonka v. Cent. Garden & Pet Co.*, No. 02–CV–02394– RPM, 2008 WL 486049, at \*2, 2008 U.S. Dist. LEXIS 12022, at \*6 (D.Colo. Feb. 19, 2008). Neither of these cases addresses or cites the Federal Circuit's decision in Hoechst Celanese.

■■■ 82. Hoechst Celanese holds that the grant of a reexamination and interim PTO rejections are not probative (i.e. not relevant, and therefore not admissible) evidence on the question of patentability. *Cf. Rowe Int'l Corp. v. Ecast, Inc.*, 586 F.Supp.2d 924, 967 (N.D.Ill.2008) (recognizing that grant of reexamination is not probative of non-patentability in the context of summary judgment proceedings on validity and citing Hoechst Celanese).

83. The Federal Circuit's *Seagate* decision did not disturb this holding of Hoechst Celanese. As a result, the interim PTO decision on the Krippelz '903 patent cannot be considered to have decreased the objective likelihood that Ford was infringing a valid patent.

## B. Ford's Non–Infringement Arguments In Period 2 Were Insufficiently Supported

84. In September 1999, Ford filed its first motion for summary judgment of non-infringement. (Ex. I, 9/24/1999 Br. In Supp. Of Ford Motor Co.'s Mot. For Summ. J. Of Non–Infringement.) Ford's brief failed to offer claim construction of any claim term to support its argument. *See Abbott Labs.*, 544 F.3d at 1358 ("The first step in most infringement suits is the procedure called 'claim construction,' where the scope of the claim is defined by the court.").

85. Ford's brief simply asserted without supporting analysis that the Ford Explorer/Mercury Mountaineer puddle lamp device (the only accused puddle lamp de-

vice at the time) generates a conical beam of light that directly impinges on the side of the Ford Explorer/Mercury Mountaineer. (Ex. I, 9/24/1999 Br. In Supp. Of Ford Motor Co.'s Mot. For Summ. J. Of Non–Infringement 10, 13.)

86. Ford offered two non-infringement arguments: (1) that claim 2 of the '903 patent cannot cover any lighting device that shines any type of light on the side of the vehicle, even though the claim 2 does not require that no light of any type strikes the side of the vehicle (an argument that essentially ignored the "conical beam of light" limitation in claim 2), and (2) that Krippelz had disclaimed coverage of warning lights that facilitated ingress and egress to the vehicle, even though the disclaimer was made with respect to an independent claim not at issue in the lawsuit. (*Id.* passim.) Both of these arguments lacked merit and were insufficiently supported.

■■■ 87. In offering the first argument, Ford ignored the claim term "conical beam of light" in claim 2 of the Krippelz patent. Ford proffered no construction of this term, and made no effort at all to distinguish between light that forms a beam and light that does not.

88. Throughout this case, Ford represented that it did not know the difference between a beam of light and non-beam light. However, a Ford-owned patent details at least one example of the difference between beam light and non-beam light (albeit in a somewhat different context) in the same way the Board of Patent Appeals and this Court did:

> In a bulb and reflector system, a filament of the bulb is placed at or near a focal point of a reflector. **The light emitted by the bulb filament is collected by the reflector and reflected outward to form a light beam.** A lens

is used to shape the light beam into a specified pattern as established by vehicle lighting standards. **Typically, a conventional bulb and reflector system collects and reflects only thirty percent of the light emitted from the bulb filament.**

89. As this passage of Ford's patent explains, an optical reflector creates a beam, but light that comes from the filament and does not reflect from the reflector is not a part of that beam.

90. This is not a case where the infringer proffered a "reasonable construction under which [its] products did not infringe," and thus could avoid willful infringement because "the proper claim construction was a sufficiently close question." *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1374 & n. 4 (Fed.Cir.2008). Ford's deliberate avoidance of the key claim term shows its lack of a coherent infringement defense, and thus its recklessness.

91. Ford's second non-infringement argument was that Krippelz had disclaimed in prosecution coverage of warning lights that facilitated ingress and egress from the vehicle. (Ex. I, 9/24/1999 Br. In Supp. Of Ford Motor Co.'s Mot. For Summ. J. Of Non–Infringement 6, 13.) Reasoning that Ford's puddle lamps do facilitate ingress and egress, Ford argued that they could not infringe.

92. But the disclaimer to which Ford points was made with respect to claims not at issue in this lawsuit, all of which require a "flashing" light. (JX1, '903 Patent File History, 6/6/90 Amendment (by Krippelz) at 3.) Ford's disclaimer argument was transparently erroneous.

93. This prosecution history language falls far short of the required "clear and unambiguous" claim scope disclaimer that would have been required to provide Ford a defense on this point. *Seachange Int'l,*

*Inc. v. C–COR, Inc.,* 413 F.3d 1361, 1373 (Fed.Cir.2005).

### C. During Period 2, Ford Added New Puddle Lamp Designs To Additional Ford Vehicles Without Conducting Any Analysis

94. From March 1999 until the February 2002 Board of Patent Appeals decision, Ford continued its infringing activity and increased it, adding puddle lamp devices to new vehicle models without conducting any analysis of the additional devices.

95. In particular, and again without conducting an infringement analysis, Ford added new puddle lamp devices to several of its model year 2002 vehicles (introduced in late 2001). (See PX147, Detail of Ford Puddle Lamp Mirror Assembly Purchases by Model Year/Calendar Year From Ford Suppliers Through Approximately October of 2008 (chart showing number of infringing sales and model year/calendar year information for those sales).) Ford first informed Krippelz's counsel of these additions by letter in July of 2002, nearly a year after infringing sales began. (Ex. L, 7/19/02 Letter From Seth Rodack To James Ryndak.)

96. In 2004, Ford confirmed that it had done no analysis of these additional puddle lamps, stating in a letter to Krippelz's counsel: "we have not examined these products to determine whether their courtesy lamps are identical to the accused products and we make no representations regarding their similarity or dissimilarity." (Ex. M, 4/19/04 Letter From Seth Rodack To James Ryndak.)

97. Only after Krippelz had done a prelitigation analysis and only after Krippelz accused certain additional models did Ford itself undertake any technical analysis of these devices. Ford's counsel admitted this to Krippelz's counsel in a July 2006 letter, stating: "We are conducting

our own analysis of the lamp modules that you identified in your letter." (Ex. N, 7/11/06 Letter From Thomas Lewry To James Ryndak.)

### D. Ford's Assertion That Krippelz "Failed To Try To Stop The Infringement" Is Incorrect Both Legally And Factually

98. Ford's primary ground for defeating a claim of willful infringement during period 2 is that Krippelz waived his right to damages for willful infringement by failing to move for a preliminary injunction.

99. Ford relies on *Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.,* 553 F.Supp.2d 939, 953 (N.D.Ill.2008), vacated on other grounds, 555 F.3d 984 (Fed.Cir.2009), for the proposition that "when a patent holder makes no attempt to stop infringement after litigation has commenced, despite a legal mechanism for doing so, willful infringement should not be found on the basis of such post-filing conduct." *Id.* at 953 (citing *Seagate,* 497 F.3d at 1374).

100. Ford appears to argue that *Seagate* establishes a categorical rule that a patentee must move for a preliminary injunction in order to recover for willful infringement. (Ford Br. 6–8.) Ford's primary ground for defeating a claim of willful conduct during period 2 was that Krippelz failed to move for a preliminary injunction. (*Id.*) This argument fails for two reasons.

### 1. First, Krippelz's Claim, And This Court's Findings, Of Willfulness Do Not Rest Solely On Postlitigation Conduct

101. As the Court has found, Ford's willful conduct began before the start of this litigation. Ford learned of the Krippelz patent when Krippelz sent Ford his patent shortly after it issued in 1991, and again received notice of the patent when Ford became aware of the Donnelly pat-

ent. Both events took place before this litigation began. (*See supra* ¶¶ 18–37.)

102. Despite having knowledge of the Krippelz patent, Ford did nothing in the prelitigation period to investigate whether its products infringed the Krippelz '903 patent, nor did it identify any potentially invalidating prior art. (*See supra* ¶¶ 36, 45–48, 56–63.) Ford simply began selling infringing products, disregarding the objectively high likelihood that it was infringing a valid patent.

### 2. Second, Seagate Does Not Require Krippelz To File A Motion For Preliminary Injunctive Relief

103. The proposition that failure to seek a preliminary injunction constitutes a forfeiture of a claim for willful infringement is neither an absolute nor a general rule applicable to all patent cases. In *Seagate,* the Federal Circuit addressed the situation where a patentee with a meritorious claim of willful infringement will be able to show likelihood of success on the merits. Ordinarily, such a patentee will be entitled to a preliminary injunction and therefore should not be permitted to "accrue enhanced damages based solely on the infringer's post-filing conduct." *Seagate,* 497 F.3d at 1374. Thus, "in ordinary circumstances, willfulness will depend on an infringer's prelitigation conduct." *Id.*

104. But *Seagate* did not establish a categorical rule that a patentee must move for a preliminary injunction. *Seagate* qualified its statement that ordinarily a patentee will be entitled to a preliminary injunction and therefore should not be permitted to "accrue enhanced damages based solely on the infringer's post-filing conduct." *Id.* Shortly following that passage, *Seagate* stated:

> We also recognize that *in some cases a patentee may be denied a preliminary injunction despite establishing a likelihood of success on the merits,* such as

when the remaining factors are considered and balanced. In that event, whether a willfulness claim based on conduct occurring solely after litigation began is sustainable will depend on the facts of each case.

*Id.* (emphasis added).

105. *Seagate* recognizes that patentees with meritorious cases but otherwise ineligible for preliminary injunctive relief still are permitted in appropriate cases to recover for willful infringement. Such is the case here.

106. The pursuit of a preliminary injunction may fail for reasons other than its lack of merit on the underlying claim. Even a strong claim for injunctive relief will ordinarily fail when an inventor who does not practice the invention and does not compete with the infringer sues for an injunction.

107. It is a general rule of equity that injunctions should not issue where money damages will suffice because irreparable injury cannot be shown. This principle is applicable to patent injunctions. *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006).

108. The Court can envision the rare case where an inventor, while not in direct competition with an infringer, could secure a preliminary injunction if the inventor had well-formed plans to compete against the infringer and demonstrated, for example, that the infringer was effectively locking up, for a period of years, a substantial share of customers for the patented device. There is no flavor of that in this case.

109. Krippelz could not have gotten an injunction in this case, and, while only the Court knows that for a certainty, Krippelz could reasonably and wisely conclude that he would not win; that it would be a waste of time and resources, his own and the Court's, to make the effort. In other words, under *eBay,* Krippelz likely could not have obtained preliminary injunctive relief because the balance of hardships favored Ford. *Seagate* does not require that Krippelz file a motion he did not stand a reasonable chance of winning in order to perfect a claim for willful infringement.

110. Also, even without the qualifying language, *Seagate's* preliminary injunction discussion was limited to cases where the willfulness claim is "based on conduct occurring solely after litigation began." 497 F.3d at 1374. Thus, to the extent *Seagate* imposes any obstacle to recovery based on failure to seek preliminary injunctive relief, it does not apply in this case, where Ford's willful conduct began before the start of this litigation. (*See supra* ¶¶ 102–03.)

### 3. Third, Ford, Not Krippelz, Is Largely Responsible For Delays In This Litigation

111. Ford suggests that apart from the failure to seek an injunction, its conduct is mitigated by the fact that Krippelz did not actively pursue summary judgment on infringement. This is not a persuasive argument.

112. As discussed below in the section regarding period 3, summary judgment (sought by both Krippelz and Ford) was delayed, in significant part, by disputed device-testing initiated 26 by Ford, and also by Ford's persistence in making arguments in contravention of a proper construction of the patent. (*See infra* ¶¶ 118–19, 138–73, 181–82.)

### III. Period 3: February 2002 Board Decision Through Ford's Disclosure Of New Prior Art In April 2007

113. Period 3 begins with the Board of Patent Appeals decision in February 2002 and ends with Ford's disclosure of new prior art in April 2007. During this period

(and, where relevant, for the final period as well) the Court finds as follows:

114. Following the Board of Patent Appeals decision affirming the validity of the Krippelz '903 patent, Ford did not disclose any new prior art until 2007. (Ex. O, 4/19/07, 5/14/07, 7/3/07 Letters From Steven Johnson To Mark Suri (disclosing DuBois, Siegfried, and Miazzo respectively).) Ford also did not pursue any of the prior art that had occupied the Board of Patent Appeals. Ford offered no viable prior art defense for five years.

115. The Court finds, in other words, that from the Board's decision in February 2002 until Ford's disclosure of new prior art in April 2007, Ford lacked any objectively reasonable prior art defense in this case.

116. Ford chose not to pursue the defenses it had offered prior to the reexamination, either in expert reports or at trial.

117. With respect to infringement, the Court finds that Ford did defend on non-infringement grounds. However, Ford offered non-infringement defenses that required a significantly different claim construction than that employed by the Board. Ford's non-infringement defenses were objectively unreasonable. Indeed, the Court rejected Ford's proffered claim construction, on which its non-infringement position depended, in 2003, 2004, and 2006. (Dkt. Nos. 103, 125, 132, 158, and 198 (2/24/03, 2003 WL 466109, 5/13/03, 2003 WL 21087109, 8/6/03, 2003 WL 21838077, 7/20/04, 2004 WL 1576697, and 7/27/06 Orders (concerning claim construction)).) The Court granted summary judgment of infringement in Krippelz's favor on November 21, 2008. (11/21/08 Hr'g Tr. 9:24–19:11.)

118. Delay in resolving the question of which Ford lamps were infringing was a consequence of flawed testing procedures used by Ford. Specifically, Ford devised a seat-of-the-pants experiment that it used to contest Krippelz's 2003 motion for summary judgment of infringement.

119. During the delay caused by Ford's flawed testing procedures, Ford introduced new infringing puddle lamp devices on several Ford models. Throughout this time period, Ford did so without performing any infringement analysis.

120. In more detail, the Court makes the following findings regarding period 3:

**A. During Period 3 Ford Lacked Any Objectively Reasonable Invalidity Defense**

**1. Ford Did Not Develop The Invalidity Defenses It Offered At Trial Until Mid–2007**

121. In February 2002, after the Board of Patent Appeals rendered its decision confirming the claims of the '903 patent, the litigation resumed.

122. Krippelz had served initial contention interrogatories seeking any invalidity defenses Ford might have in May 1998. (Ex. G, 5/22/98 Pl.'s Interrogs. Nos. 1 and 2 to Def. (Re: Invalidity Defenses).) Ford had an ongoing obligation to supplement these interrogatory responses in a timely fashion. *See supra* ¶ 62; Fed.R.Civ.P. 26(e)(1)(A); *see also Wright v. Touhy,* 2003 WL 22439864, at *4 (N.D.Ill. Oct. 28, 2003) ("The duty to supplement discovery requests lingers on without subsequent solicitation.").

123. Ford did not produce the prior art on which its expert ultimately relied until April 19, 2007 (DuBois), May 14, 2007 (Siegfried), and July 3, 2007 (Miazzo). (*See supra* ¶ 115; Ex. O, 4/19/07, 5/14/07, 7/3/07 Letters From Steven Johnson To Mark Suri (disclosing DuBois, Siegfried, and Miazzo respectively).)

124. These are the only prior art references on which Ford's expert relied in his expert reports. The only conclusion con-

sistent with Ford's obligation to supplement its discovery responses is that Ford did not have these references until shortly before they were produced. Based on this discovery record, Ford could not have relied on DuBois, Siegfried, or Miazzo as evidence of invalidity before April 2007.

125. Ford's expert did not offer any invalidity opinion citing any other reference, and Ford cited no other references at trial (Ford pursued only Miazzo and DuBois at trial).

## 2. Ford's Arguments On Matsuda And Kim Are Waived And Incorrect

126. Ford contends that after the reexamination and before its discovery of DuBois, Siegfried, and Miazzo, it had a reasonable invalidity defense based on the Kim and Matsuda references. (Ford Br. 27–29.)

127. Ford provides no information as to its actual state of mind on this point, and no details as to what it contends would be the objective indicia establishing its reasonable reliance on these defenses. For example, Ford provides no expert declaration to support these contentions on an objective basis. Ford could have done so in the context of this willful infringement trial phase, but did not.

128. Ford contends that in the Board's treatment of the Matsuda reference, the Board concluded sub silentio that a bulb and an external curved reflector could not make a beam of light. (Ford. Br. 27–28.) Ford has not offered this interpretation of the Board opinion before, whether in the context of claim construction, summary judgment or otherwise, and has not supported it with expert evidence or other disclosure. This unsupported contention comes too late to be considered.

129. Additionally, Ford's interpretation of the Board's opinion is without merit. The Board did not say that only a light bulb with an internal reflector can make a beam. Indeed the entire discussion of the Kim device ray trace Dr. Hansler submitted (which treated the inside of the Kim hood as reflective) would have been unnecessary if the Board believed that only a bulb with an internal reflector could make a beam:

> With regard to whether the Kim reference suggests a beam of light, as claimed, Dr. Hansler, in the supplemental declaration, offers evidence of a computer modeling simulation of the lighting device depicted in Kim. The computer model assumed that the internal surfaces of the Kim enclosure were reflective and that the light source in Kim is a small incandescent lamp. Results, shown in Exhibit A of the supplemental declaration, indicate that light emanating from the Kim device is not in the form of a light beam, but rather light which is very diffuse and unevenly distributed . . . .

(PX3, Reexamination File History, 2/25/02 Board of Patent Appeals & Interferences Decision On Appeal 14–15.)

130. If the Board had concluded that a light bulb needed an internal reflector to make a beam, this entire discussion would be moot because the Kim reference discloses an ordinary bulb with an external reflector. Thus, Ford's criticisms of the Board's decision as it relates to Matsuda and Kim are themselves objectively unreasonable.

131. Finally, Ford contends that "[a]fter receiving the Court's 2003 construction, Ford objectively believed that the Matsuda [sic] could invalidate Krippelz's patent." (Ford Br. 28.) Ford provides no detail as to how it objectively could have reached this conclusion in light of the numerous differences between Matsuda and Krippelz. These differences were set forth by Krippelz's expert in a declaration submitted to the PTO during the reexamination. (PX3, Reexamination File History, 2/29/00

Hansler Decl. at 4–5 6(b).) Again, Ford's expert has offered no analysis of Matsuda in any of his reports. Ford did not offer Matsuda at the liability trial, nor did it provide evidence in support of its claim of objectively reasonable reliance in the willful infringement phase. I reject Ford's contention, as it is unsupported by the evidence and not credible.

132. Ford also offers an "analysis" of the Kim patent that purports to prove that Dr. Hansler's ray trace actually shows that Kim creates a beam. (Ford Br. 28–29.) Here again, however, no expert in this case has ever provided support for such a proposition, which I reject.

133. This argument is also transparently untenable. In the reexamination proceedings, Dr. Hansler pointed out that no portion of the Kim reflector is parabolic. (PX3, Reexamination File History, 2/29/00 Hansler Decl. at 3 6(a).)

134. Ford contends that Dr. Hansler's ray trace of the Kim device contains "parallel" rays that would constitute a beam. (Ford Br. 28–29.) No expert, nor the Board, nor the Court, ever construed the term "beam of light" to mean "parallel rays." As the Court's claim construction stated:

> A light bulb and reflector can make a beam of light if the filament of the light bulb is at or near the focal point of an optical reflector. Parabolic and elliptical reflectors are types of optical reflectors.

(12/12/08 Trial Tr. 961:16–19.)

135. Ford makes no effort in its brief to demonstrate that this portion of the Kim reflector is a parabolic or other type of optical reflector. Even the rays Ford identifies as "parallel" are not parallel to the naked eye. (Ford. Br. 28–29.)

136. In sum, Ford lacked any objectively reasonable invalidity defense for the five years between February 2002 and at least the middle of 2007.

**B. During Period 3 Ford Relied On Objectively Unreasonable Claim Constructions To Support Its Non–Infringement Arguments**

137. During period 3, Ford continued to argue non-infringement.

138. After the reexamination, rather than ignore claim 2's "conical beam of light" limitation, Ford sought a construction of this claim term that would include all of the light that leaves the disputed device. (See, e.g., Dkt. No. 132, 8/6/03 Order 2 (denying a proposed Ford construction that would have defined "beam of light" as "all light from the source of light that passes through the housing opening").)

139. Ford's proffered claim construction was objectively unreasonable at least in part because it required a claim-reading approach significantly different from that employed by the Board of Patent Appeals, which found that a bulb in a hood does not a beam make.

140. The Board of Patent Appeals provided a description of the claim term "beam of light"—"directed light having some defined sweep range."

141. The Board concluded that the Kim device did not create a "beam of light": "In contrast to the light 'beam' disclosed and claimed by appellant, the three primary references applied by the examiner [including Kim] do not disclose such a light 'beam.'" (PX3, Reexamination File History, 2/25/02 Board of Patent Appeals & Interferences Decision On Appeal 10.)

142. In the context of summary judgment briefing in 2008, Krippelz again pointed out the conflict between Ford's position and the intrinsic record. Ford argued (for the first time) that the Board had somehow failed to consider the Kim housing or hood in its analysis of the device. (Dkt. No. 319, 4/4/08 Ford's Motor

Co.'s Opp'n To Krippelz's Mot. For Summ. J. Of Infringement at 27 (accusing Board of committing "error" by "not consider[ing] Kim's hood").)

143. Ford's suggestion that the Board failed to consider Kim's hood was baseless. The Kim application shows a hood in all of its figures. (PX3, Reexamination File History 58–59 (Kim Application Figs. 1–4).) The Board also considered Dr. Hansler's supplemental declaration in the reexamination, in which Dr. Hansler performed ray traces on the Kim device including the hood. (PX3, Reexamination File History, 2/25/02 Board of Patent Appeals & Interferences Decision On Appeal 14–15.)

144. The Board looked at these same figures from the same exhibit cited above, and concluded:

> Results, shown in Exhibit A of the [Hansler] supplemental declaration, indicate that light emanating from the Kim device is not in the form of a light beam, but rather light which is very diffuse and unevenly distributed and that such light from the Kim device would, in fact, directly impinge on the side of the vehicle. Again, the evidence presented appears very impressive, especially in view of the examiner's silence.

(*Id.*)

### 1. Ford Persisted In Pursuing Its Rejected Non–Infringement Theory Even Through The Final Round Of Summary Judgment Briefing

145. Despite the Board's rejection of Ford's claim construction and this Court's rejection of Ford's proposed construction in August 2003 (Dkt. No. 132, 8/6/03 Order 2), Ford persisted in conducting years of litigation of the infringement issue based on rejected defenses and flawed testing.

146. In 2003, Krippelz attempted to bring the infringement issue to a close by moving for summary judgment. (Ex. F To Nonrestricted Exhibits Certification,

8/14/03 Pl.'s Mot. For A Summ. J. Adjudication Of Each Element Of Claim 2 Of United States Patent No. 5,017,903.)

147. When Krippelz served Ford with his motion for summary judgment of infringement, the Court had already construed the claim term "conical beam of light." The Court held that there was a difference between beam and non-beam light, and that "[d]etermining the existence of a beam, its shape, and other characteristics is a matter of examining the device and making appropriate measurements and calculations." (Dkt. No. 132, 8/6/03 Order 2.)

148. Ford's opposition to Krippelz's motion for summary judgment relied on purported results of testing of a Ford Explorer device by Ford's expert Dr. John Van Derlofske. (Ex. T, 10/15/03 Ford Motor Co.'s Br. In Resp. To Pl.'s Motion For A Summ. J. Adjudication Of Infringement Of Each Element Of Claim 2 Of U.S. Patent No. 5,017,903 at 14–18.)

149. Ford's opposition also depended on the same arguments that the Court and Board had already rejected. Thus, Ford included light rays from the filament as part of what it said was the "beam of light." Ford argued that "[t]he lamp filament is recessed well within the housing and shaped to a beam by the housing opening." (*Id.* at 18.) But Kim also had a housing and its light source was a light bulb with a filament, and the Board found Kim did not make a beam.

150. Ford offered no explanation of how its theory could be reconciled with the Board's treatment of Kim. Ford compounded the error by including light from non-parabolic reflector portions as part of the purported "beam of light" in its device. (*Id.*)

151. But again, the Board's decision had already rejected this approach. Dr.

Hansler's submission to the Board considered the Kim device as if its interior surface were reflective and the Board accepted that these reflecting but non-optical surfaces do not form a beam.

152. In short, throughout this phase, Ford continued to pursue its non-infringement claim even after its proffered claim construction was rejected by both the Board of Patent Appeals and this Court.

153. Ford contends there was a good faith dispute leading all the way up to trial about whether light directly from the filament of a bulb could constitute part of a "beam of light." (See Ford. Br. 12, 14–15.)

154. There was no reasonable good-faith dispute on this issue. Both the Court and the Board of Patent Appeals rejected Ford's position. Ford's refusal to accept the intrinsic record and the Court's claim construction rulings does not provide a basis for a reasonable infringement defense.

155. Ford advanced several non-meritorious non-infringement defenses during this time period, e.g. that the preamble limited the claim and that its housings were not substantially adjustable. Some of these defenses were not reasonably based positions.

156. Ford had no objectively reasonable non-infringement defense during this time period. It is difficult to look at the Ford defense during period 3 and find any reasonable basis for what it did as a whole. At least some of it falls into the category of last-ditch desperation.

2. **The Court's 2003 Ruling On Krippelz's Motion For Summary Judgment, And The Litigation Activity That Followed, Do Not Change The Analysis**

157. Ford also relies in its defense on this Court's February 24, 2003 denial of Krippelz's motion for summary judgment of infringement. Ford's non-infringement defense at that time was that all the light from the Ford devices was part of a "beam." As discussed earlier, the Board's treatment of the Kim device and this Court's claim construction foreclosed this theory.

158. This Court denied Krippelz's motion for summary judgment, but only after Ford argued that even under the proper construction, beam light directly impinged on the side of the vehicle.

159. Ford argued "[the puddle lamp's] housing opening and the source of light are positioned such that the [beam of] light directly impinges on the side of the vehicle." (Dkt. No. 103, 2/24/03 Order 8.)

160. But after five additional years of litigation, Ford never offered admissible evidence to support this representation to the Court. Instead, Ford stuck to its rejected position that all light from the devices is part of a "beam of light" (a position the Board, the Court, and Ford's own patent had rejected).

161. When the Court granted summary judgment of infringement in 2008, it was on the substantially identical grounds that Krippelz had presented in his 2002 motion. (Compare Ex. J To Nonrestricted Exhibits Certification, 6/12/02 Hansler Decl. at 12–17 & Ex. L thereto with Ex. H To Restricted Exhibits Certification, Rhiner Expert Report at 26–28 & Ex. K thereto (detailing infringement analysis of the original Ford Explorer puddle lamp and reaching identical conclusions).)

162. Ford argues that Krippelz should be held to blame for the delay in resolving infringement because Krippelz did not renew his motion for summary judgment after the Court denied his motion in 2003. (Ford. Br. 12.)

163. However, on August 13, 2003, Krippelz served Ford with a second motion for summary judgment of infringe-

ment, according to this Court's practices. (Ex. F To Nonrestricted Exhibits Certification, 8/14/03 Pl.'s Mot. For A Summ. J. Adjudication Of Each Element Of Claim 2 Of United States Patent No. 5,017,903.) Summary judgment was delayed, in significant part, by disputed device-testing initiated by Ford, and also by Ford's persistence in making arguments in contravention of a proper construction of the patent.

164. Ford's testing was deeply flawed and it took a lot of time and effort to resolve the problems created by that testing. The Court does not rehearse the details of the testing controversy here because there is already an inordinate portion of the record devoted to the question. The delay is, in largest part, to be laid at Ford's door.

165. As this Court wrote in a pretrial order:

> One example of Defendant's process was its early testing in 2003 of [ ] devices which le[ ]d to a needless controversy over the integrity of the testing process. Assuming, as I willingly do, that Defendant acted in good faith, its conduct created a needless controversy which delayed the litigation for no good reason. To put it another way, Defendant used a seat-of-the-pants design to engineer its defense, either because it did not want to bear the cost of better design or because it knew better design would not help its cause.

(Dkt. 399, 12/5/08 Order (concerning motions in limine) 2.)

166. In other words, Ford's device testing and litigation conduct are what derailed Krippelz's attempt to obtain summary judgment, extending Ford's period of willful infringement by several years.

167. What Ford can and does argue is that the Court did not grant summary judgment on infringement until the eve of trial. Part of that is due to the presence of more than this case on this Court's docket, and part of it is due to the manner in which the case was litigated.

168. In opposition to Krippelz's motion for summary judgment, Ford filed an expert's report which in its conclusions clearly established that there were triable issues on infringement, but only upon very close examination did it become apparent that these conclusions could be reached only by disregarding the way the Court had construed the patent. It is, ordinarily, not to be expected that an expert finally selected by one party to a patent case would offer opinions inconsistent with the *Markman* rulings in that case.

## 3. Rudolph Guzik Provided No Grounds For Ford's Defense, And Ford's Photographs Are Inadmissible And Arguments Based On Them Are Waived

169. Ford argues that an "independent expert," Rudolph Guzik, reached a non-infringement opinion despite never having read the patent, the file history, or the Court's claim construction opinions. (Ford Br. 18–20.) This Court appointed Mr. Guzik to investigate Ford's device testing described above.

170. Mr. Guzik did not reach, and was not asked to reach, any conclusion as to infringement. (See Ford Ex. 12, 2005 Guzik Report at 2 ("I have no idea what kind of information will contribute to settling the current dispute-nor do I have any understanding of the issues in the conflict.").)

171. By the parties' agreement, Mr. Guzik never received a copy of the Krippelz patent, did not review the Court's claim construction rulings, and was not to formulate opinions, and Mr. Guzik's testing therefore could not provide any objective basis for a non-infringement defense.

172. Ford also relies on photographs of puddle lamp devices allegedly showing beam light on the side of the vehicle. (Ford Br. 20–21.) These photographs are not a part of the record in this case, and are not accompanied by any authenticating fact or expert testimony. Ford wisely presented no such argument in the context of infringement proceedings, and did not provide any foundation for the photographs.

C. **Without Reasonable Grounds, Ford Continued To Add Infringing Puddle Lamps To More Vehicles**

173. Again, during this period, Ford continued to add infringing puddle lamps to more vehicles.

174. Ford added the puddle lamp feature to still more of its best-selling vehicles, including the Ford Freestar, Mercury Monterey, and others. (PX147, Detail of Ford Puddle Lamp Mirror Assembly Purchases by Model Year/Calendar Year From Ford Suppliers Through Approximately October of 2008 (chart showing number of infringing sales and model year/calendar year information for those sales).)

175. As discussed above, *see supra* ¶¶ 97–98, Ford admitted that it had conducted no analysis on these models before infringing. (Ex. N, 7/11/06 Letter From Thomas Lewry To James Ryndak.)

176. By the end of period 3, Ford had offered nothing that it could use in defense of the claim. All it had done was try to wriggle out of the Court's Markman ruling by indirect methods. Unless that ruling is reversed on appeal, reasonable defenses are limited to those consistent with that ruling and Ford did not honor that limit.

177. In short, much, if not all, of what Ford offered in its defense until April 2007 was impermissible, and what may not have been impermissible was clearly without merit.

IV. **Period 4: From April 2007 Until The Close Of Trial**

178. Period 4 begins with the disclosure of three pieces of prior art in April 2007 and ends with the verdict at trial. I find that Ford has not been proven to be a willful infringer during period 4.

179. Ford offered three pieces of prior art in support of its claims of invalidity, to wit, DuBois, Siegfried, and Miazzo, in support of anticipation and obviousness. (Ex. O, 4/19/07, 5/14/07, 7/3/07 Letters From Steven Johnson To Mark Suri (disclosing DuBois, Siegfried, and Miazzo respectively).)

180. Ford declined to offer Siegfried at trial and that reference could not support a finding of invalidity.

181. Miazzo was, as Ford should have known, inadmissible in light of the claim construction ruling and the fact that it teaches away from the '903 patent. (See 12/9/08 Trial Tr. 249:23–250:8, 260:18–261:3, 337:18–339:16, 339:2–9; 12/10/08 Trial Tr. 368:21–370:22.)

182. DuBois did not disclose the "conical beam of light" or the proper placement of the light.

183. Nonetheless, the case against willful infringement during this period is, ironically, the strongest that Ford has to offer because Ford had some evidence on which it could rely to conclude that the objectively high likelihood of infringement of a valid patent was not known to it or obvious enough that it should have known. (12/9/08 Trial Tr. 239:5–7, 270:24–290:18.)

184. The law permits a party to defend against the accusation of the state of mind (knew or should have known) element of a willful infringement claim by showing that at certain periods (if not all periods) the state of mind element of willfulness did not exist.

185. The fact that Ford had some evidence of invalidity on which it could reasonably rely serves to assist Ford in its arguments that willful infringement is not proven with respect to period 4.

186. Period 4 evidence marked a significant contrast to Ford's status through periods 1 through 3, where Ford was a willful infringer without even the minimal justification for its conduct that it possessed in period 4. Krippelz contends that the period 4 evidence is too weak to support a defense to willful infringement. Krippelz argues that Miazzo can't be used without violating the claim construction; that the DuBois device bears even less resemblance to the Krippelz claim than did the Kim device considered by the Board of Patent Appeals; and that Ford ultimately decided not to even offer the Siegfried reference at trial.

187. As for non-infringement, Krippelz contends that Ford apparently had no expert analysis until late 2007, when Ford's expert performed computer simulations on the Ford puddle lamps using software called LightTools™. (*Id.*)

188. Krippelz argues Ford's expert did this work without even attempting to satisfy the legal requirement for using such a modern software tool in a non-infringement analysis; and that, when caught on this point, Ford never made more than a token effort to defend its use of Light-Tools™. (*Id.*)

189. Krippelz argues Ford never attempted to prove that such simulations satisfied the requirement of *Raybestos-Manhattan, Inc. v. Texon, Inc.*, 268 F.2d 839, 842 (1st Cir.1959), that they were "known to the art at the time of the application for the patent [and] that were [ ] generally used at the time." *Abbott Labs. v. Alra Labs., Inc.*, No. 92 C 5806, 1997 WL 667796, at \*6 (N.D.Ill. Oct. 24, 1997). (Krippelz Opening Br. 21.)

190. The Court finds that the LightTools™ computer simulations were inadmissible because Ford never offered evidence that the simulations were in general use in 1989 and therefore never offered evidence that they satisfied the Raybestos requirement.

191. Nonetheless, the Court finds that Ford had sufficient evidence of invalidity in period 4 that the objectively high likelihood of infringement of a valid patent was neither known to Ford nor obvious enough that Ford should have known of it

## CONCLUSION

192. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1338(a).

193. Krippelz has shown by clear and convincing evidence that Ford willfully infringed the Krippelz patent throughout period 1.

194. Krippelz has shown by clear and convincing evidence that Ford willfully infringed the Krippelz patent throughout period 2.

195. Krippelz has shown by clear and convincing evidence that Ford willfully infringed the Krippelz patent throughout period 3.

196. Krippelz has not shown by clear and convincing evidence that Ford willfully infringed the Krippelz patent during period 4.